***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Chapman.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The employee is Emory "Dale" Eudy. The employer is Snyder Packaging. The carrier at risk is the North Carolina Guaranty Association.
2. At all relevant times, Snyder Packaging regularly employed three or more employees and was bound by the North Carolina Workers' Compensation Act. An employer-employee relationship existed between the employer and the employee on or about June 14, 2001, the date of the alleged compensable injury reflected on I.C. File Number 211214.
3. On June 14, 2001, plaintiff sustained an injury by accident arising out of and in the course of his employment with Snyder Packaging.
4. After the hearing, the parties stipulated that plaintiff's average weekly wage was $441.06, which yields a compensation rate of $294.04.
5. In addition, the parties stipulated into evidence the following:
a. Defendants' answers to plaintiff's interrogatories;
b. Packet of medical records consisting of 134 pages;
c. Plaintiff's personnel records from Snyder Packaging;
d. Plaintiff's answers to defendants' interrogatories; and,
e. Personnel records from Charlotte Pipe and Foundry.
6. The Pre-Trial Agreement dated February 2, 2004, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was 27 years old at the time of the hearing before the Deputy Commissioner, and was a high school graduate, began working for Snyder Packaging in June 1996. At the time in question, he worked as a dye cutter operator, a job that involved setting up and running a machine that perforated and cut paper that would be used to make items like cigarette boxes. The job involved significant lifting in that plaintiff would have to lift three- to four-inch stacks of paper that were on average 23 by 18 inches in size in order to put them in the machine, and would later lift the processed paper out of the machine to stack it on a pallet.
2. On June 14, 2001, plaintiff sustained a compensable injury by accident when he reached inside his machine to clear a jam and the cylinder inside the machine rolled backwards several inches, catching his fingers and bending his left hand backwards, causing a hyperextension injury to his wrist. Later that day, he went to the emergency room where his hand was x-rayed. There were no fractures demonstrated, so the emergency room physician put plaintiff's hand in a splint, prescribed medication, and gave him work restrictions. Plaintiff next saw the physician's assistant at his family doctor's office on June 21, 2001, and complained of persistent pain at that time. He was treated conservatively with medication and an elastic wrap.
3. During the next several months, plaintiff continued to work, but experienced some pain, swelling, and a popping sensation in his left wrist. The symptoms worsened in November, and on November 12, 2001, plaintiff went to Dr. Shepherd, his family doctor, who prescribed mediation and restricted plaintiff to light-duty work. His symptoms persisted, so he was subsequently referred to Dr. Skahen, an orthopedic hand surgeon.
4. Dr. Skahen examined plaintiff on November 26, 2001, and noted that plaintiff's symptoms were in the ulnar aspect of his left wrist. The doctor ordered an MR arthrogram to rule out a triangular fibrocartilage complex (TFCC) or ligament tear. The test was performed and was interpreted by the radiologist as showing a probable tear of the volar radioulnar ligament, but an intact TFCC. Dr. Skahen reviewed the films and thought there might be a peripheral TFCC tear near the ulnar styloid. Since plaintiff's symptoms were worsening, Dr. Skahen recommended a diagnostic arthroscopy.
5. Defendants would not authorize the procedure until plaintiff obtained a second opinion, so he was examined by Dr. Burrows on January 14, 2002. Dr. Burrows noted complaints of persistent swelling, mostly on the ulnar side of the wrist, aching pain, and intermittent popping with occasional burning and tingling along the ulnar nerve distribution. Dr. Burrows reviewed the MR arthrogram, examined plaintiff, and concluded that the proposed surgery was reasonable. Consequently, on January 31, 2002, Dr. Skahen performed the operation. During surgery, he noted that there was an intermittent click with testing under anesthesia, but he found the TFCC to be intact, although there was evidence of a healed tear of the peripheral fibrocartilage. Dr. Skahen also found synovitis, which he shaved. However, it appeared that the doctor did little more than examine the wrist through the arthroscope and that the procedure was essentially diagnostic in nature as opposed to therapeutic.
6. Following surgery, Dr. Skahen sent plaintiff to physical therapy. On February 18, 2002, the physical therapist noted that plaintiff reported he had continued to have clicking and popping in his wrist since the operation. Thereafter, plaintiff reported problems with pain, swelling, and weakness, but his condition improved with therapy. At the last therapy visit on March 7, 2003, plaintiff advised that he still felt functionally impaired at work, secondary to pain with use and decreased grip strength. Consequently, the physical therapist recommended four more weeks of therapy. However, when Dr. Skahen examined plaintiff the next day, he concluded that plaintiff had reached maximum medical improvement and released plaintiff to full-duty work with no permanent impairment. No further therapy was authorized.
7. Plaintiff was not satisfied with Dr. Skahen's final report and was sent to Dr. Boatright, another orthopedic surgeon, for a second opinion regarding the issue of permanent impairment. Dr. Boatright examined plaintiff on May 10, 2002. Plaintiff advised the doctor that surgery had not helped him, that he still had pain and weakness in the same areas, that his hand swelled and got tired with use, and that he would sometime have numbness in it. After examining him, Dr. Boatright concluded that plaintiff had not reached maximum medical improvement but needed further work-up to determine if he had compression of the ulnar nerve at the elbow. There was some delay, but the nerve conduction study recommended by Dr. Boatright was performed on July 24, 2002, and proved to be within normal limits. After reviewing the test results, Dr. Boatright then indicated that plaintiff had reached maximum medical improvement and released him.
8. The symptoms in plaintiff's left hand persisted, but he was able to do his regular job duties until September 26, 2002, when plaintiff was changing a bolt on his machine and his left wrist popped as he turned a four-inch-long Allen wrench with his left hand. Plaintiff's employer sent him to Cabarrus Urgent Care on that date. Although the doctor there noted that plaintiff was complaining of pain on the radial side of the hand, rather than the ulnar side, it was the doctor's impression that plaintiff had popped some scar tissue from the prior injury. The portals from the surgery were on the back of the wrist, and it was at one of those portals where plaintiff had felt the pop. The doctor prescribed medication for him and, at plaintiff's request, allowed him to resume regular work.
9. Plaintiff was not satisfied with that medical evaluation and discussed the matter with his medical case manager, who subsequently made arrangements for him to see Dr. Ward, another orthopedic hand surgeon. Dr. Ward examined him on October 8, 2002. The doctor noted that plaintiff's complaints were along the dorsal ulnar aspect of his left wrist and that plaintiff was tender along the extensor carpi ulnaris (ECU) tendon. He placed plaintiff's hand in a cast. Three weeks later he removed the cast, gave plaintiff a splint, and instructed him to do range of motion exercises. When plaintiff next returned to the doctor on December 9, 2002, he indicated that he still had pain when he used the hand. Consequently, Dr. Ward injected plaintiff's hand in the area of the ECU tendon sheath. The injection gave him significant relief, but his symptoms started returning by the next office visit on December 9, 2002.
10. On January 6, 2003 plaintiff returned to Dr. Ward with persistent soreness along the ulnar styloid and some burning along the ulnar nerve distribution. Dr. Ward diagnosed his condition as ulnar styloid impingement with possible ECU tendonitis and ulnar neuropathy at the elbow. The doctor recommended surgery to the wrist and elbow. His recommendation was renewed at the next office visit on January 30, 2003, and he expressed concern about further delay since plaintiff's fine motor control appeared to be getting progressively weaker.
11. Having already had surgery delayed because defendants wanted a second opinion, plaintiff then made arrangements to get a second opinion regarding the need for surgery with Dr. Poehling, an orthopedic surgeon at Wake Forest University Baptist Medical Center. Dr. Poehling examined plaintiff on March 24, 2003. It was Dr. Poehling's opinion, and the Full Commission finds as fact, that plaintiff had complex regional pain syndrome (reflex sympathetic dystrophy) affecting his ulnar nerve, caused by the compensable accident of June 14, 2001. He recommended that plaintiff be treated with medications to quiet the central nervous system response before surgery was performed, because the mechanical symptoms could not be delineated well until then and surgery could cause the pain syndrome to become worse. Dr. Poehling rated plaintiff's disability at 15% of his left hand.
12. Dr. Poehling explained that plaintiff's complex regional pain syndrome resulted from his June 14, 2001 injury. The hyperextension injury stimulated plaintiff's nervous system and extended from the nerve at the location of the hyperextension to a place in the spinal cord where nerves pass and intermix with each other and from there through the central nervous system to other parts of the body. He further explained: "So what that really means is that it's likely that there are multiple pathways that can occur in this kind of an injury that can give us what we see in this patient, which is a disabled person who lacks endurance, who lacks the ability to do things consistently, yet has normal conduction velocities, complains of burning pain, can't sleep, and all of the other things that are fairly typical of patients that have this problem."
13. Dr. Poehling was of the opinion, and the Full Commission finds as fact, that the complex regional pain syndrome did not result from the September 26, 2002, problem with the wrench. He explained: "Just the way it looks to me, his chronic pain syndrome was primarily down the ulnar nerve. He was complaining of the ulnar nerve symptomology before that second injury. So, you know, the second injury certainly didn't make it any better, but I think it's an exacerbation of a pre-existing problem, is what I think."
14. Plaintiff then returned to Dr. Ward on May 22, 2003. Dr. Ward did not have a copy of Dr. Poehling's report and was unaware of the additional diagnosis. However, plaintiff expressed reluctance to have the surgery Dr. Ward had recommended, so he was released from care at that time since Dr. Ward only had surgery to offer.
15. Plaintiff continued to have the same problems with his wrist until the date of hearing before the Deputy Commissioner. Although plaintiff testified to his willingness to have the surgery recommended by Dr. Ward, and indicated that his reluctance to have the procedure in May 2003 was due to financial issues (because he wanted to make certain that the operation would be paid for by defendants), the evidence did not establish that surgery would now tend to effect a cure and give him relief since Dr. Ward indicated that he would need to reevaluate plaintiff regarding whether surgery would still be advisable in view of the passage of time.
16. Defendants have admitted liability under the Workers' Compensation Act for plaintiff's June 14, 2001, injury pursuant to a Form 60 filed with the Industrial Commission. Due to their unreasonable refusal to answer some of the questions in plaintiff's interrogatories, it was not clear what compensation had been paid to plaintiff, particularly since he had had to return some checks. In any event, they paid him at an incorrect compensation rate. According to plaintiff's testimony, which has been accepted as factual, he missed five days of work prior to the operation due to medical appointments related to his injury, and he missed three weeks of work after surgery. Plaintiff then returned to light-duty work for a period of time before going back to his regular job. Dr. Skahen kept him out of work from the date of surgery until the February 11, 2002, appointment when he was released to light-duty work. Plaintiff was not released to full-duty until the follow-up appointment on March 8, 2002.
17. Defendants have denied that the left hand problems for which plaintiff has been treated since September 2002 were a proximate result of the injury by accident giving rise to this claim. Dr. Skahen, who appeared to have disregarded plaintiff's complaints of pain, has supported their position. However, it was clear from the physical therapy notes and from Dr. Boatright's records that, contrary to Dr. Skahen's findings, plaintiff did not have a normal wrist when Dr. Skahen last saw him on March 8, 2002. Plaintiff's testimony that he continued to experience pain, swelling, and popping in the wrist has been accepted by the Full Commission as factual. Furthermore, based upon the greater weight of the credible medical evidence, the Full Commission finds that the left wrist problems for which plaintiff was treated on and after September 26, 2002, were a direct and natural result of the June 14, 2001, injury by accident.
18. As of the date of hearing before the Deputy Commissioner, plaintiff had not missed any additional time from work due to his left hand injury, in part because he had pushed himself and his doctors in order to perform his regular job. In November 2003, plaintiff quit working for Snyder Packaging in order to take a higher paying job with a different company. However, it appeared that plaintiff might have to be out of work in the future in order to have further surgery to his wrist. Plaintiff currently needs to be reevaluated by Dr. Ward to determine what further treatment should be rendered. He has not reached maximum medical improvement from his injury. Consequently, no findings are made regarding the extent of any permanent partial disability plaintiff may sustain as a result of the injury.
19. No separate claim is before the Full Commission regarding the compensability of the September 26, 2002, incident; thus, no findings have been made regarding that incident except to the extent that the symptoms plaintiff developed on such date were related to the June 14, 2001, injury that gave rise to this claim.
20. Defendants have failed to reimburse plaintiff for mileage expenses associated with driving to doctors' appointments.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. Plaintiff is entitled to compensation at the rate of $294.04 per week for all of the weeks during which he was unable to work by reason of the temporary total disability he sustained as a result of this injury by accident on June 14, 2001. Defendants are entitled to a credit for compensation previously paid. N.C. Gen. Stat. §§ 97-29, 97-42. Plaintiff is entitled to compensation at the rate of $294.04 per week for 30 weeks for the 15% rating to the left hand.
2. The left wrist problems for which plaintiff was treated on and after September 26, 2002, were a direct and natural result of the injury by accident giving rise to this claim. N.C. Gen. Stat. § 97-2(6); Click v.Pilot Freight Carriers, Inc., 300 N.C. 164 (1980); and Vandiford v.Stewart Equipment Company, 98 N.C. App. 458 (1990).
3. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including the treatment to his left wrist since September 25, 2002, and the future treatment recommended by Dr. Ward. Should Dr. Ward recommend surgery after a current evaluation and should plaintiff elect to have the operation, he is entitled to have defendants provide it. N.C. Gen. Stat. §§ 97-2(19), and 97-25.
4. Plaintiff is also entitled to have defendants pay appropriate mileage expenses for the medical appointments arising from his injury. N.C. Gen. Stat. §§ 97-2(19), and 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorneys fee set forth below, Defendants shall pay compensation to plaintiff for temporary total disability at the rate of $294.04 per week from February 20, 2002, through March 9, 2002. (The Form 28 filed by defendants in this case showed that they only paid compensation through February 19, 2002.) Also subject to the attorney's fee set forth below defendant shall pay to plaintiff disability at the rate of $294.04 for 30 weeks for the 15% rating to his left hand. All of this compensation has accrued and shall be paid in a lump sum subject to the attorney's fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, including those arising from the treatment to his left wrist since September 25, 2002, and from the future treatment recommended by Dr. Ward. Should Dr. Ward recommend surgery after a current evaluation and should plaintiff elect to have the operation, defendants shall provide it.
3. Upon receipt of a properly completed Form 25T, defendants shall promptly pay plaintiff's mileage expenses.
4. An attorney's fee in the amount of twenty-five percent of the compensation awarded herein is hereby approved for plaintiff's counsel, which shall be deducted from the aforesaid award and paid directly to plaintiff's counsel. Plaintiff's counsel is also entitled to twenty-five percent of any future compensation paid to plaintiff in this claim.
5. Defendants shall pay the costs.
This 31st day of January 2005.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/____________ BUCK LATTIMORE COMMISSIONER